IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:19-CR-90-S |
| ELKIN ACOSTA LOPEZ | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR RELEASE PENDING SENTENCING**

Defendant Elkin Acosta Lopez moves to be released after having been found guilty but awaiting sentencing on the basis of a generalized risk of infection by the novel coronavirus. *See* Doc. No. 77 (Def.'s Emergency Motion for Release Due to COVID-19 Pandemic). Defendant, however, has not demonstrated by clear and convincing evidence that he is unlikely to "flee or pose a danger to the safety of any other person or the community if released[.]" 18 U.S.C. § 3143(a)(1). For reasons cited below, the defendant's motion should be denied.

**I.  FACTUAL AND PROCEDURAL HISTORY**

Defendant Elkin Acosta Lopez is a foreign national from the country of Colombia. Defendant propped up his business in his home country by laundering stolen jewelry and diamonds from violent Hobbs Act robberies. The robbers, who have connections to Defendant, used a combination of violence and firearms to steal the jewels from the traveling jewelers. Defendant and other jewelry launderers play an integral role in the

large conspiracy—that is, defendant and other fences laundered the stolen proceeds, thus providing funds that fueled the violent robberies.

In June 2016, five Hobbs Act robbers used force, violence, and a firearm to steal the jewelry from Victim 1.  *See* United States v. Johnnattan Ramirez, 3:16-CR-326-N.  Victim 1, who did not want to lose his jewels, fought back to hold onto his uninsured jewels.  While he held on for his life and his jewels, some of the Hobbs Act robbers—nee, associates of Defendant—stabbed and punched Victim 1.  Eventually, Victim 1 lost control of his jewels.  But after relinquishing his jewels, one of the robbers kicked him in the head.  With Victim 1's jewelry in tow, the robbers left Victim 1 on the ground to die.

Immediately thereafter, the robbers called Defendant, who was in the country of Colombia at the time.  Defendant, seeing a business opportunity, flew into the United States to meet the robbers in Houston, Texas.  Defendant met with the robbers in a hotel room to negotiate the jewelry purchase.  The criminals collectively agreed on a price, and Defendant handed over thousands of dollars in cash and arranged for tens of thousands of dollars in cash to be delivered in New York and back in Colombia to the robbers and their associates.  By the point the parties agreed on a price, Victim 1's family was experiencing the tragic and unthinkable loss of a loved one.

Multiple cooperating witnesses indicated that defendant Elkin Acosta Lopez knew of the death of the traveling jeweler before he bought the stolen proceeds.  Yet Defendant—with greed in his eyes and poison in his heart—went ahead with the deal and laundered the criminal proceeds from Victim 1.  Defendant took the loot back to Colombia, where it could be sold to turn a profit.

Defendant Elkin Acosta Lopez has helped launder stolen jewelry from Hobbs Act robberies on other occasions. The Government intends to present evidence at his sentencing hearing regarding these occasions. But suffice it to say Defendant is connected to robberies, through the laundering of criminal proceeds, on four occasions. Defendant's criminal network expanded across two separate crews—the Malpica crew and the Ramirez crew. Numerous cooperating witnesses from both crews indicated that Defendant knew he was buying jewels from robberies. *See* Ramirez, 3:16-CR0326-N; United States v. Johnathan Malpica et. al., 3:16-CR-56-L. All but two of twenty-one robbers has been sentenced. In the Ramirez case, the Honorable Judge Godbey has sentenced defendants to 13,15, and 25 years, respectively.

On February 21, 2019, a federal grand jury in the Northern District of Texas charged Defendant with one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (h). The conspiracy relates to Defendant's decision to launder proceeds after the death of Victim 1. On March 18, 2019, the FBI arrested Defendant in New York, New York, after he had taken a flight from Bogota, Colombia, to New York. Agents met Defendant at the airport.

On that same day, Defendant appeared before a United States Magistrate Judge in the Eastern District of New York, Brooklyn Division. *See* Doc. 6 (Rule 5 Documents). Defendant was ordered detained pending his transfer to the Northern District of Texas. *See id.* On March 29, 2019, Defendant appeared before United States Magistrate Judge Rebecca Rutherford for an initial appearance. *See* Doc. No. 13. Defendant waived his

right to a detention hearing and was ordered detained by Judge Rutherford pending the outcome of this case.  *See id.*

**2.**   **LEGAL STANDARDS**

Pursuant to Federal Rules of Criminal Procedure, Rule 46(c), Section 3143(a) governs the defendant's release because the defendant has been found guilty and is awaiting sentencing.  Further, unlike pretrial, where the burden rests upon the government to establish flight risk or safety risk, the burden now rests upon the defendant to show by "clear and convincing evidence" that he is not likely to flee or pose a danger to the safety of another person or to the community.  Fed. R. Crim. P. 46(c); 18 U.S.C. § 3143(a)(1).  Courts should consider the following factors in determining whether a person poses a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).

**3.**   **ARGUMENT AND ANALYSIS**

    **A.**   **Defendant is a danger to public safety and a flight risk, and thus should be detained.**

Defendant's motion, which focuses primarily on the potential of a COVID-19 outbreak in his facility, largely ignores the factors that this Court must consider in determining whether a defendant should be detained pending sentencing.  Those factors strongly support the defendant's continued detention.

### i.  Nature and circumstances of this offense (3142(g)(1))

Defendant is part of a horrific and violent gang of over 25 South American gangsters who travel across the United to commit violent robberies of traveling jewelers and then launder the proceeds from the offenses.  Defendant is key to the success of the criminal enterprise.  Indeed, Defendant, as well as other fences, create a market for the stolen jewelry, and, in effect, put hits on the heads of traveling jewelers.

Everyone involved in the criminal enterprise wins in the name of violence and greed.  The Hobbs Act robbers get cash for their robberies by laundering the proceeds.  And Defendant wins—and his network of fences—because they buy jewelry on the cheap to turn a profit.

To conceal the criminal offenses, the robbers used fake identification documents, wore masks and gloves, switched out license plates, and employed burner phones.  The hits on the traveling jewelers took no more than thirty seconds.  With lookout vehicles, rendezvous points, nominee bank accounts, and international fences, the criminal conspiracy exhibited a degree of sophistication that is unmatched.  This sophistication helped the criminal enterprise escape justice for decades.

The FBI and the United States Attorney's Office charged two groups of these Hobbs Act robbers as part of the Ramirez and Malpica crews.  All 21 defendants connected to the Ramirez and Malpica crews entered guilty pleas.  *See* Ramirez, 3:16-CR0326-N; United States v. Johnathan Malpica et. al., 3:16-CR-56-L.  Other fences, similarly situated to Defendant, have been charged and entered guilty pleas.  *See United*

*States v. Romelio Riveron*, 3:19-CR-349-K; *United States v. Rubenhay Pinkhasov*, 3:19-CR-316-B.

But such work did not come easy. To bring the robbers and fences/launderers to justice, the FBI and the United States Attorney's Office spent an innumerable amount of time and investigative resources to solidify the cases against these violent offenses. Over a three-year investigation, the investigative team learned that the criminal network expanded across the United States into Mexico and South America. In fact, during this case, the investigative team issued hundreds of subpoenas, executed over 50 search warrants, conducted an undercover sting operation, and sought and obtained extradition of approximately eight Colombian nationals.

Stage two of the investigation has focused on people like Defendant—the money launders—who created the market of violence by laundering the stolen proceeds. Again, without people like Defendant and his criminal band of money launders, the robbers would be left with a bunch of jewelry (and no cash). Defendant entered into this conspiracy because he saw a business opportunity, and he helped launder at least a million dollars in stolen jewels and diamonds. What some might argue were merely illicit business transactions were actually creating a lucrative market that incentivized deadly robberies of people nationwide.

      ii.      **Weight of the evidence (3142(g)(2))**

The weight of the evidence is overwhelmingly strong against Defendant. Multiple cooperating witnesses state in no uncertain terms that Defendant laundered stolen jewelry. They also indicated that Defendant knew that the jewelry came from robberies,

and they state that he was aware before he laundered the stolen jewelry in June 2016 that Victim 1 had died.

Investigators obtained flight records, hotel records, email records, cell phone records, bank records, and cell-site data to corroborate the multiple cooperating witness statements. Defendant entered a guilty plea almost immediately after his arrest and detention. Thus, the weight of the evidence of Defendant and his laundering activities cuts in favor of not letting a foreign-national released pending sentencing.

### iii.     Defendant's history and characteristics (3142(g)(3))

Defendant is a **<u>foreign national</u>**, who supports his business located in the jewelry district of Bogota, Colombia, by laundering stolen jewelry from Hobbs Act robberies—the same Hobbs Act robbers who use violence and firearms to perfect the crime. Defendant has associates in Bogota, Colombia, and New York, who are also involved in the money-laundering conspiracy.

Defendant has no family ties, business ties, employment ties, and frankly, any legitimate connection at all to the United States.

During his arrest in March 2019, Defendant was in possession of a series of checks drawn on someone else's bank account but that were made out him. All had been pre-signed and were suspiciously under the $10,000 reporting threshold. The five checks—that were also dated for different dates—added up to $33,400. Defendant also was in possession of travelers' checks of more than $35,000. Given defendant's criminal disposition and past conduct, it is a fair inference is that Defendant was coming back into this country to commit future crimes, not look at the Statue of Liberty.

Furthermore, Defendant has connections to very wealthy individuals in Colombia, not to mention his own substantial assets. Indeed, he has amassed his own wealth from running a successful jewelry business for over twenty years. This wealth, as well as the connection of his wealthy friends, could be used to get him across the border and back home to Colombia if released from custody prior to the completion of his criminal prosecution.

In sum, Defendant is an extreme flight risk given his background, history, and characteristics. And the Government believes that Defendant will be gone and on his way to Colombia if released pending sentencing for such a serious criminal offense. Defendant is facing substantial prison time given his crime of laundering stolen jewelry connected to violent Hobbs Act robbers. Defendant's family, employment, and life are all in the country of Colombia. There is nothing connecting Defendant to the United States other than a criminal indictment, a guilty plea, and the prospect of substantial prison time. A "friend" next to the border of Canada does not provide any assurance that defendant will appear for his sentencing. If anything, this presents the perfect opportunity for escape.

    iv. **Nature and seriousness of the danger to another person or the community posed by release (3142(g)(4))**

While Defendant did not commit the violent offenses himself, he knowingly helped create a market that incentivized these crimes. Indeed, even after a man was killed a violent robbery, Defendant helped launder the proceeds. This indicates that he will go to great lengths to benefit himself. And anyone who does this crime—that is

8

laundering jewels after a felony murder—is not someone who can be trusted on pretrial release.

### B.  Officials have established comprehensive measures to avoid—and, if it becomes necessary, address—a COVID-19 infection.

Defendant's motion for release is largely premised on the health risks he might face from a potential COVID-19 outbreak. But the existence of a pandemic, in and of itself, cannot be used by any and every defendant to avoid pretrial detention, especially in the circumstances here. *See supra* Section A; *see also Martin*, 2020 WL 1274857, at *3 (rejecting similar argument based on existence of COVID-19 after reviewing the factors outlined in the Bail Reform Act).

Defendant does not claim to be infected by COVID-19 such that he might be a danger to other prisoners. *See* 18 U.S.C. § 3142(e)(2) (directing the court to consider the safety of "any other person and the community"). Instead, Defendant relies on the speculative possibility that another person might cause him to become infected. Even assuming this Court could weigh such a speculative risk, the defendant does not account for officials' precautions to protect against and mitigate any spread of COVID-19.

For instance, BOP has been planning for potential COVID-19 transmissions since January 2020. And, on March 13, 2020, BOP announced that it was implementing the Coronavirus (COVID-19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. It has continued to

9

modify is operation plans as needed to mitigate the spread of COVID-19. Its updated plan provides for the following[1]:

- <u>Screening of Inmates and Staff</u>: All newly arriving BOP inmates are screened for COVID-19 symptoms and exposure risk factors. Asymptomatic inmates with exposure risk factors are quarantined; symptomatic inmates with exposure risk factors are isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures.

- <u>Suspension of Social Visits and Tours</u>: BOP has suspended all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. To ensure that familial relationships are maintained, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities have also been suspended.

- <u>Suspension of Legal Visits</u>: BOP also has placed a 30-day hold on legal visits—to be reevaluated at the end of 30 days—though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection under the screening protocol outlined above. Confidential legal calls are being allowed to ensure access to counsel.

- <u>Suspension of Inmate Movements</u>: BOP also has ceased the movement of inmates and detainees among its facilities, though there will be exceptions for medical

---

[1] The BOP Implementing Modified Operations plan is available at: https://www.bop.gov/coronavirus/covid19_status.jsp.

10

treatment and similar exigencies, this precaution will prevent transmissions between institutional populations. Inmate and detainee movement may continue as required to operate judicial proceedings or to process transfers related to forensic studies, writs, Interstate Agreements on Detainers, medical or mental health reasons, and residential facility placement.

- <u>Modified Operations</u>: The plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.

- <u>Staff Training and Travel</u>: Official staff travel, with the exception of relocation travel, is suspended. All staff training is suspended (to include conferences and meetings), with the exception of basic training for new staff.

As for the local pretrial detention facilities the Marshals Service contracts with, each has their own internal procedures as to how they are dealing with the COVID-19 virus and are following CDC guidelines to the best of their ability.[2] Each facility has updated their intake procedures, which includes screening each new inmate for COVID-19 symptoms, and will deny entry into their facility if an inmate demonstrates any symptoms.

Taken together, these measures should sharply mitigate the potential risks of COVID-19 transmission within a detention facility. In light of this, the mitigated risk that Defendant will be infected as a result of detention does not justify release. Defendant's speculative concerns to the contrary should not be able to trump the careful

---

[2] CDC guidelines can be found at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

balance of factors prescribed by Congress in determining whether he is properly subject to pretrial detention. *See, e.g.*, *Martin*, 2020 WL 1274857, at *3.

      **C.    The existence of COVID-19 does not justify releasing defendant.**

While the COVID-19 virus is new, health-related claims by detainees are not. Courts have generally recognized that (1) "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted, *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008), and (2) reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside, *United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999).[3] And, as to COVID-19 specifically, courts have rejected the notion that detention facility officials are incapable of addressing the threat posed. *See Martin*, 2020 WL 1274857, at *4 (noting "that the correctional and medical staff at [the specific facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus"). Put simply, in light of officials' efforts and precautions, the defendant has not made—and likely cannot make—a factual record that his potential medical needs cannot be met during detention. *See, e.g.*, *United States v. Smoot*, No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020) (rejecting motion based on increased risk from

---

[3] *See also United States v. Stanford*, 722 F. Supp. 2d 803, 813 (S.D. Tex. 2010) ("As the United States points out, Stanford is not the first pretrial detainee to suffer health issues. The FDC is well equipped to provide appropriate medical attention to detainees who may require it. Moreover, Stanford cites no case in which a defendant detained pending trial was entitled to release from detention because he may have suffered infirmities while detained.").

12

bronchitis and other respiratory ailments because defendant does not assert how conditions are not being properly managed at detention facility).

Locally and nationally, many courts have held that generalized concerns about the risk of infection by the novel coronavirus do not outweigh the statutory flight and safety considerations that counsel in favor of detention. *See, e.g.*, *United States v. Kerr*, No. 3:19-CR-296-L, 2020 WL 1529180, at *3 (N.D. Tex. Mar. 31, 2020) ("Defendant has not demonstrated why his speculative concern about an outbreak arises to an exceptional circumstance as contemplated under Section 3145(c).") (citing cases); *see also Smoot*, 2020 WL 1501810, at *3 ("The mere possibility of an outbreak at his facility does not equate to a compelling enough reason to justify his release.").

Nor does the general prospect of viral infection create an "exceptional reason" that makes detention inappropriate under 18 U.S.C. § 3145(c). *See, e.g.*, *Kerr*, 2020 WL 1529180, at *3; *United States v. Morris*, No. 17-107(01), 2020 WL 1471683, at *4 (D. Minn. Mar. 26, 2020). Although the Fifth Circuit has not given precision to what constitutes an "exceptional reason," courts have generally considered the term to refer to circumstances that are unique, uncommon, or rare, *United States v. Molina*, No. 3:17-CR-341-B, 2020 WL 58696, at *3 (N.D. Tex. Jan. 6, 2020), and have found that such circumstances are not presented by conditions that are "no more out of the ordinary and no more unique than those of other persons subject to detention," *United States v. Posada*, 109 F. Supp. 3d 911, 915 (W.D. Tex. 2015).

Awarding defendant the relief he seeks would cause the Court to be flooded with similar, generic requests. Each defendant would make the same argument and claim that

the speculative prospect of a COVID-19 outbreak justifies relief—regardless of their risk of flight or threat to the community. *See Kerr*, 2002 WL 1529180, at *3; *United States v. Fitzgerald*, No. 2:17-CR-295, 2020 WL 1433932, at *2 (D. Nev. Mar. 24, 2020) ("Defendant's argument applies equally to every detainee in detention; however, the Court cannot release every detainee at risk of contracting COVID-19 because the Court would then be obligated to release every detainee."). And given the protective measures being implemented, the specter of a COVID-19 outbreak is not materially greater in the facility and should not warrant relief in the circumstances presented here. *See Martin*, 2020 WL 1274857, at *3-4; *United States v. Steward*, No. S1:20-CR-52, 2020 WL 1468005, at *1 (E.D.N.Y. Mar. 26, 2020) ("There is also no reason to find that the defendant's release would lessen the risk to his health presented by COVID-19."). The continued detention of this defendant (and those similarly situated) is necessary to ensure public safety and does not endanger public health.

[Remainder of page left blank]

4.  **CONCLUSION**

Defendant's motion for release pending sentencing should be denied.

                Respectfully submitted,

                ERIN NEALY COX
                United States Attorney

                */s/Ryan R. Raybould*
                RYAN R. RAYBOULD
                Assistant United States Attorney
                1100 Commerce Street, Third Floor
                Dallas, Texas  75242
                214-659-8713
                ryan.raybould2@usdoj.gov